No. 2.—JAMES M. REINHART, plaintiff in error, vs. JOHN MILLER, defendant in error.

[1.] If an instrument offered in evidence is objected to on account of inter-lineations, what the interlineations were, should appear in the record; but they are not an objection to admitting the instrument in evidence. The jury must decide upon them.

[2.] When a party present, and an instrument is presented for his signature, directs another to sign it, no written authority is necessary, and if the instrument is signed and the parties immediately recognize it by acting upon it, no

Reinhart vs. Miller.

proof of the presence of the party when the instrument is signed need be made.

[3.] As between the parties to a marriage contract, it is valid, although it be not recorded.

[4.] A deed may be admitted in evidence, even if it be not recorded; but proof of its execution must be made.

[5.] No ratification of a deed necessary, when the person who signs it, is directed to do so by the party to be bound, at the time it is presented for signature, and it is immediately signed, although the party steps out of the immediate presence of the person directing it.

[6.] *All* sealed instruments do not require the attestation of two witnesses.

[7.] Attested instruments, may, under circumstances, be proven otherwise than by the subscribing witnesses.

[8.] An instrument signed by a stranger is good, if he was directed by the party to execute it, and he immediately does so, although the subscribing witness know nothing of the direction so given.

[9.] Hearsay evidence inadmissible.

[10.] Reference to the evidence given in the case made by the presiding Judge, in deciding a point raised by counsel in the progress of a cause, is not error.

[11.] When the decision of the Court in refusing a continuance is excepted to, the grounds of the motion must be stated.

Trover, in Montgomery Superior Court. Tried before Judge FLEMING, at March Term, 1857.

This was an action of trover, brought by James M. Reinhart, against John Miller, for the recovery of three negroes, which he claimed by virtue of his intermarriage with Cassa Miller, to whom they belonged.

Plaintiff proved, that the negroes belonged to Cassa Miller, his late wife, prior to their intermarriage. Proved the marriage and her death; the value of the negroes—demand and conversion; and closed his case.

Defendant held the negroes as trustee under a marriage settlement which he alleged was executed between the plaintiff and said Cassa Miller, prior to, and in contemplation of their marriage, and by the terms of which, said property, if she died, leaving no children, was to go to her brothers and sisters.

Defendant offered in evidence the depositions of the follow-ing witnesses as preliminary to, and laying the foundation for, the introduction of the marriage settlement, to-wit:

*Julia Ann Gay:* Knows the parties—did not see the con-tract executed or signed by Reinhart, Cassa Miller or John Miller. Did not witness it, was not present when the con-tract was signed, did not read the contract, knows not wheth-er Reinhart was satisfied or not, *John Miller just previous to the marriage came to the door, his sister was inside dressing, requested her to sign her name to the contract. She autho-rized him in my presence to sign her name to it for her.* There were on the premises at the time of the marriage, Nathaniel Gay, Laura Gay, Lewis Beacham, Elisha Wilkes and wife, Missouri Gay, Susan Bridges, now Susan Curry, and Alexander M. Wright.

To the *Cross Interrogatories,* she answers: I did not see the contract executed, nor do I know when it was done. I did not read the contract or hear it read. I did not see Cassa Miller sign her name to the contract, but she told her brother John to do it for her—she could write her name. I do not know when the contract was made or where it was signed, or whether signed by Reinhart at all. Do not know whether Alexander Wright signed the contract or not. I did not sign it, nor did I see any person do so. Beacham married them; John Miller went after him and came with him; does not know who wrote the contract, John Miller had it in posses-sion after it was signed. Cassa Miller seemed the most anx-ious to have it signed, and said she would not marry him unless he did sign it, and said she expected he would not sign it, it was so very tight, and if he did not sign it there would be no marriage between him and her that day. John Miller did not urge her to sign the contract, but she author-ized her brother to sign the contract. I did not see any sign-ing done that day. Knows nothing, &c.

*Laura Gay's* deposition: I saw a contract before Cassa Miller and James M. Reinhart were married, the contract

annexed looks to be the same. I did not witness it or see any one do so. I do not know whether Reinhart was satisfied or not, did not hear him express himself. I did not see it executed nor did I hear it read.

*Cross Interrogatories.*—I know nothing about the contract, only there was a contract before marriage, but where executed and witnessed I am unable to say. She, Cassa Miller, could write her name but did not do so. I heard her tell her brother John Miller to sign her name to the contract, and her reasons for telling him to do so, was, she was dressing. Knows not who signed or in what part of Gay's premises the contract was made, don't know whether Alexander Wright signed as witness or not; did not sign herself, nor does she know who were parties or witnesses. Lewis Beacham married them. John Miller went after him and returned with him,—does not know who wrote the contract. Saw John Miller have it. Saw no anxiety to have it signed, nor did I see any urging, it all seemed voluntary.

*Nathaniel Gay's* deposition: I saw the contract executed, and signed by the said James M. Reinhart, John Miller, and John Miller signed his sister Cassa's name. I subscribed the same and was present when Lewis Beacham, James M. Reinhart and John Miller signed their names. I cannot write, and authorized John Miller to write my name to it. I made my mark. Lewis Beacham read a portion of the contract and handed it to John Miller who read the balance, it was then handed to James M. Reinhart who had it sometime, and appeared satisfied with its contents, and expressed himself so, and said he did not care for the property, it was not what he wanted. Had property enough of his own. He signed it voluntarily. There was no compulsion and the contract was executed previous to the marriage ceremony.

*Cross Interrogatories.*—I saw a marriage contract executed and believe the annexed to be the same. It was executed at my house in Laurens County, Ga., on or about the 6th day of February, 1853. Lewis Beacham read a portion (and

repeats the answer to the direct interrogatory about reading and handing to Reinhart.) Myself, Lewis Beacham, J. M. Reinhart and John Miller were present outside of the fence and Alexander M. Wright was in the door yard about two or three yards from us. Cassa did not sign her name, John signed for her. Does not know whether she could write or not. It was signed outside of the yard on a gate post about 25 or 30 yards from the house, and Lewis Beacham, James M. Reinhart, John Miller and myself out side of the yard, and Alexander M. Wright inside of the yard. If he came outside of the yard I did not see him. He did not sign the contract. I signed it and so did Lewis Beacham as witnesses. If Wright signed it I did not see it, nor do I believe it was done at my house. Beacham and myself signed as witnesses, Reinhart, Cassa Miller and John Miller as parties. Lewis Beacham married Reinhart and Cassa, and John Miller went after him. I do not know who wrote the contract. John Miller had it in possession as well as James M. Reinhart and Lewis Beacham at the time it was signed; and after Reinhart signed it with the others, he handed it to John Miller. I saw no anxiety to have it signed and no urging about it. It all appeared voluntary. I did not see Cassa sign her name. John Miller did so for her. It was at my house in Laurens County about the 6th February, 1853. James M. Reinhart, Beacham, Miller and myself were outside and Wright inside of the fence.

*Lewis Beacham's* deposition.—I saw James M. Reinhart sign the contract, also John Miller, and John Miller signed his sister's name. I subscribed the same as witness, and was present when it was signed. I think the contract hereto annexed to be the same, or at least I believe so. I read a portion of it, handed it to John Miller who read the balance. The contents to the best of my belief are the same. Reinhart appeared satisfied, and was the first who signed it. If he had any objections, he did not express them in my presence. He signed it voluntarily. The contract was execu-

ted before marriage. I believe the signature is mine. If there have been any alterations in the contract I cannot perceive it. It reads to me the same as heretofore; and I believe the marriage contract here annexed, to be the same that I signed.

*Cross Interrogatories:* I saw a marriage contract executed between Reinhart, Cassa Miller and John Miller, as trustee, at the house of Nathaniel Gay, in Laurens County, Georgia. I read a portion of the contract, found some words I could not make out, and handed it to John Miller who read the balance in the presence of, as far as I can recollect, John Miller, Reinhart, Wright and myself; Cassa Miller was not present when the contract was signed. Is unable to say whether she could write her name. The contract was signed outside of Gay's fence which encloses his house, thirty yards more or less from the house. It was signed by Reinhart first, I saw him sign it in the presence of Wright, Miller and myself. I have no recollection of any other person being present, though there might have been. I will not swear positively that Wright did sign said contract but to the best of my recollection he did so. I saw Reinhart and John Miller sign their own names, and John Miller sign his sister's name as parties, and I as witness. I believe the contract to be the same, and that Wright signed as a witness, but I may be mistaken. I performed the marriage ceremony, John Miller came for me. I do not know who wrote the contract, I think Miller showed it to me. It was executed and handed back to him. It was signed by Reinhart voluntarily. There was no anxiety or urging manifested. Cassa Miller was not present. I left all parties apparently friendly and satisfied. Cassa did not sign her name in my presence. I have stated where it was, and it was about the 1st of February, 1853.

Defendant then proposed to introduce the following marriage contract, viz:

STATE OF GEORGIA, ⎱ This Indenture of three parts,
Montgomery County. ⎰ made and entered into, this Februa-
ry the 5th day, in the year of our Lord, eighteen hundred
and fifty-three, between James M. Reinhart of said State and
county of the first part, Cassa Miller of said State and coun-
ty of the second part, and John Miller of said State and
county of the third part, witnesseth, that the said James M.
Reinhart of the first part, for and in consideration of marriage
to be had and solemnized between the said James M. Reinhart
of the first part, and the said Cassa Miller of the second part,
does for himself, heirs, executors and administrators, covenant,
grant and agree that all the lands that may be given her, the
rights, members and appurtenances to said lands, and three
negroes to-wit: Georgiana, a girl about sixteen years of age,
Amy a girl, about four years of age; Milly, a girl two years
of age, now in the possession of Cassa Miller, and all other
property which may at any time be given said Cassa Miller
by her father or other persons, by will or otherwise, shall
form and remain to be her separate property, and estate;
and shall not in Law or equity be subject to the use
of James M. Reinhart; and at her death, if leaving no chil-
dren, to go to her brothers and sisters and in nowise to be
subject to the payment of the debts of the said James M.
Reinhart, or be subject to be sold or conveyed, or in any man-
ner controlled by him the said James M. Reinhart; but the
rights and title of said property shall be *vested* in said
John Miller of the third part for the use and benefit
of said Cassa Miller; and said James M. Reinhart further
covenants and agrees that said Cassa Miller may dispose of
said property by will to any person she may appoint, subject
however to be used by said James M. Reinhart with the ap-
probation and consent of said John Miller, during the con-
tinuance of the coverture, for the mutual benefit and advan-
tage of said James M. Reinhart and Cassa Miller. And the
said James M. Reinhart and Cassa Miller, nominate and
appoint said John Miller trustee of said property, who

is authorized to possess himself of and control said property in conformity with this indenture, and the said John Miller consents and agrees to his said nomination and appointment of trustee as aforesaid.

In testimony whereof, the parties of the first, second and third parts have hereunto set their hands and affixed their seals, the day and year above written.

J. M. REINHART, [*L. S.*]

CASSA MILLER, [*L. S.*]

JOHN MILLER, Jr. [*L. S.*]

Signed, sealed and delivered in the presence of

his

NATHANIEL ⋈ GAY,

mark.

LEWIS BEACHAM, *J. P.*

CLERK'S OFFICE, Montgomery County.

The within agreement or contract, recorded in Book, P. P. on Folios 80 and 81, this November 23d day, 1854.

To the admission of which contract in evidence, plaintiff objects upon the following grounds:

1st. That there were interlineations apparent upon its face, and defendant must explain them before he can have the use of the deed in evidence.

2d. 'That as it was apparent from the deed and the admissions of defendant, that John Miller had signed his sister's name, the defendant could not introduce the contract, (a written and sealed instrument,) in evidence, until he had first proven that Miller had been authorized by his sister to sign her name to the contract, which authority, if she was not present at the time of executing the contract, must be shown by a writing under hand and seal.

And 3d. That the contract had not been recorded in the county of the husband's residence, as is by statute required.

All of which grounds were overruled and the instrument was admitted.

Defendant here closed.

Plaintiff offered in rebuttal, the depositions of *Green T. Kellam,* who *knows* the parties, asked Miller who wrote the contract, said he did from Cobb's Forms. Boarded at the house of John and Cassa Miller's father about five months. Knows the negroes. They were claimed by Mrs. Cassa Reinhart. They were in the possession of James M. Reinhart. The negro woman Georgiana worked on his farm. If the bill of sale to said negro was in possession of Reinhart, Miller said he would have to give it up to him, and Reinhart did give it up rather than have a difficulty. I heard John Miller, Sr., say that he had given said negro to Mrs. Reinhart.

*Cross Interrogatories:* Did live at the house of Miller, Sen.; Miller, Jr., resided there. His property was there so far as I know. It was his house. He superintended the hands of his father. I did not know the negro Georgiana to work on any other than Reinhart's farm. I knew the hands of Miller, Sr. to work sometimes on Reinhart's farm. The other negro woman of Miller, Sen. did wait on Mrs. Reinhart. I never knew Reinhart to say he did not claim title to said negroes.

*Lewis Beacham,* sworn, says: The contract was signed outside of the yard, twenty-five or thirty yards from the house, never saw Cassa Miller till she came into the house to be married. She was not present at the signing, nor did witness hear her give John Miller any authority to sign her name for her, saw Reinhart sign and signed himself as a witness. To the best of witnesses' belief and recollection, Wright was present when the contract was signed, and was a subscribing witness. Wright asked some question about the seal to Reinhart's name. Did not recollect whether Gay was present; but it seemed reasonable that if Gay had been present, witness could not have forgotten it, as he (witness) and Gay were not on speaking terms with each other; had no recollection of seeing Gay till he stepped in at the back door towards the kitchen, which was after the instrument had been signed, and the witness had gone to and taken his seat

in the house. If Gay's name had been on the instrument at the time of witness signing it, witness thought he ought to have recollected it. He might have signed, but if so witness does not recollect it. John Miller with John Currie came to witness' house after Mrs. Reinhart's death, and asked witness if he remembered who were the subscribing witnesses to the contract. Witness answered Wright and myself. Miller replied no, you are mistaken, dont you remember it was Gay and yourself? Witness answered no, I do not so recollect. The interrogatories were executed in Miller's house. He was requested by commissioners to leave the room before any questions were answered. Doors of the room where commissioners were situated were not closed. Miller had no conversation with witness.

*Cross-Examined.*—The signature to the marriage contract offered in evidence by defendant, looked like witness,' but he could not say it was or it was not. Said he would not deny it; when asked if he *believed* it to be his signature, he said *it looked* like his, and he could not deny it. (Did not know that Cassa was on the plantation at the time of signing the contract.) He said in a few minutes after signing said contract as aforesaid, he went into the house and performed the marriage ceremony for said James M. and Cassa.

*Arthur Davis* sworn, on the opening of the case by the plaintiff, answered to the cross examination, that he heard Reinhart say there was a marriage contract between himself and his wife.

Here the testimony closed on both sides; and after argument of counsel, the court was by plaintiffs requested to charge, *inter alia*:

1st. That defendant cannot hold under the marriage contract, if it was not recorded in the county of the husband's residence, in compliance with the statute.

2d. That a deed conveying real estate must be recorded before it can be properly admitted in evidence.

3d. That "where the act of the agent was by deed the ratification also must in general be by deed."

4th. That all sealed instruments must be signed, sealed and delivered in the presence of two witnesses; and that if neither of the attesting witnesses heard Cassa Miller authorize John Miller to sign the contract for her, and that if in that case its execution has not been proved to be in her presence, nor to have been where she could see it at the time it was executed, it is not a case of constructive presence.

5th. That this instrument should have been signed by all the parties thereto in the presence of the attesting witnesses, or that the witnesses should have heard the authority given to others by the parties to sign for them. And

6th. That to be a constructive presence, Cassa Miller must have been in view of the parties and witnesses at the time of the execution of the instrument, and the witnesses must have heard the authority given for the signing.

All of which requests to charge, his Honor, Judge FLEMING, refused; and instead thereof did charge, *inter alia*:

1st. That others than the subscribing witnesses to a deed, may prove the authority given to a third party for its execution.

2d. That the authority given by one to another to sign a deed may be proved by others than the attesting witnesses to the deed.

3d. That it was not necessary for Cassa Miller, after authorizing her brother to sign her name to the contract, to be herself in view of the other parties and witnesses; nor for the attesting witness to hear the authority given; nor for her to have seen the signing. And

4th. That it was not necessary, under the peculiar circumstances of this case as disclosed by the testimony, for John Miller's authority to sign his sister's name to be in writing, or to have been given in the hearing of the subscribing witnesses.

Whereupon the cause was submitted to the jury, and a verdict found for defendant.

And counsel for plaintiff now moves for a new trial, on the following grounds, to wit:

1st. That his Honor, Judge FLEMING, erred in the several charges and refusals to charge above stated.

2d. That he erred in admitting said marriage contract in evidence, without having the party introducing it to explain the interlineations apparent upon its face; and in holding that the law presumed the interlineations to have been made before the execution of the deed, and that it was incumbent on the party attacking the deed to show the contrary.

3d. That he erred in refusing to admit the testimony of Charles L. Holmes, who was offered to prove that he had had a conversation with Alexander M. Wright, now deceased, shortly after the marriage of Mr. Reinhart and Miss Miller, and before the commencement of any suits, for the property embraced in said contract, and that Wright told him he was a subscribing witness to the contract.

4th. That his Honor erred in stating in the hearing of the jury, that if it was proven that Cassa came to the door while dressing and told her brother to sign for her, it was a *sufficient presence;* and that as it was in evidence, that she had said she would not marry plaintiff unless he signed the instrument, and it being admitted that they did marry, it raised *a strong presumption that the contract was executed before marriage;* because these were questions of fact, and should have been left to the finding of the Jury without any expression of opinion from his Honor, as to what had or had not been proven.

5th. That his Honor erred in refusing plaintiff's motion for a continuance, sought on the imperfect execution of interrogatories, if he did so, on the ground that the exceptions to the sufficiency of the answers and to the manner of executing the interrogatories, came too late; as plaintiff not hav-

ing introduced, or offered to introduce, any testimony, and not having opened his case to the jury, did not consider the case before them.

6th. That the verdict is contrary to evidence, and to the principles of justice and equity.

The Court overruled the motion for a new trial, and plaintiff excepted.

Y. J. ANDERSON, for plaintiff in error.

W. B. GAULDEN, for defendant in error.

*By the Court.*—McDONALD, J. delivering the opinion.

This bill of exceptions throws upon this Court, pressed as it is for time, and oppressed by labor, to look through the entire record, to search out the errors complained of, when according to the statute, the errors should be plainly and distinctly set forth; and I will add, according to my construction of the Act, should be as methodically set forth as they formerly were in the assignment of errors, which is now done away.

The first exceptions apparent in this record are, that there were interlineations apparent upon the face of the marriage contract offered in evidence, and on that account the defendant objected to reading it in evidence until they were explained.

2d. That there was no writing, under hand and seal, to Miller from his sister authorizing him to execute the contract, and it was not done in her presence.

3d. That the contract was not recorded in the county of the husband's residence.

[1.] The decision of the Court overruling these objections to the evidence is excepted to.

In regard to the first, the nature of the interlineations does not appear in the record, whether they altered the instrument in a material part or not. That was a matter, however, to be

referred to the jury, and whether the alterations were made since the execution of the instrument, and whether they found contrary to evidence in that respect, we cannot tell, as the interlineations may have been of such a description, that there was no temptation to the party to make them.

[2.] John Miller signed his sister's name to the contract. It is not signed as agent.

A stranger may seal a deed, "by the allowance or commandment precedent, or agreement subsequent, of him that is to seal it, before the delivery of it, and it is as well as if the party did seal it himself." 1 *Shep. Touch.* 57. The evidence was express as to the "commandment precedent to the delivery" by the party who was to sign it. Her brother went to the door of the room where Cassa Miller was dressing, and requested her to sign the contract. He must have had it with him. She authorized him to sign her name. It was signed near the yard on the gate-post and under circumstances which warranted the Court to submit the contract and the evidence to the jury.

[3.] The Act in regard to recording marriage settlements was intended for the exclusive benefit of *bona fide* purchasers and creditors. The instrument is valid between the parties. For the reason already assigned, the first request of plaintiff ought not to have been given in charge to the jury.

[4.] There was no ground for the second request. This was an action of trover for the recovery of negroes. The deed was good without a witness for the personalty. It was also admissible in evidence, whether recorded or not, if the execution was proven.

[5.] There was no occasion for a ratification in this case, of any sort, under the view we have taken of it. It was Cassa Miller's own act, performed by her brother, by her command. But had a ratification been necessary, it was ratified by the act of the party. The instrument was proven to have been executed. Cassa Miller had declared that she would not marry Reinhart until he did execute it. She did mar-

ry him. From these facts it must be inferred that the deed had been executed before the marriage, and that she knew it.

[6.] There is no authority for saying that all sealed instruments must be signed, sealed and delivered in the presence of two witnesses. It is true in regard to conveyances of land and donations of slaves under our statutes and judicial decisions, but it does not go beyond.

[7.] In this case negroes alone were the subject of litigation, but if the land also had been in controversy, there was no necessity for further proof to send the contract to the jury. If the subscribing witness to an instrument denies or forgets his attestation, circumstances may be resorted to for proof of its execution. 4 *Wendell* 282 ; *Jackson vs. Christman* 8 ; *The King vs. The inhabitants of Longor*, 4 *Barn. & Adol.* 647. The attesting witnesses to the marriage contract differ in their testimony in this case in regard to the attestation. One of the witnesses could not write. He testifies that Alexander M. Wright, when the contract was executed, was two or three yards from them, in the door yard, and that he did not sign it.

Lewis Beacham, the other witness, could write, and testifies to the execution of the instrument and to his own signature, and to the contents, but yet says that he believes Wright was a subscribing witness, but may be mistaken. He does not even recollect that Gay was present or a witness, nor does he remember that his name was to the contract when he signed ; and still Gay's name is directly above his on the instrument, and Wright's name does not appear. The evidence of Davis, in this state of things, that he had heard the plaintiff say that he had a marriage contract with his wife, was entitled to great consideration as evidence of its due execution.

[8.] Whether the witnesses knew of the authority of, or direction to Miller to sign, has nothing to do with the validity of the contract. If he was directed to sign it, and signed agreeably to the direction, in such manner as to make his

signing a valid execution of it, it was sufficient. But these things should, of course, have been made out on the trial, by either direct or circumstantial proof, and the circumstances testified to by the witnesses were before the jury.

[9.] The proof proposed to be made by Charles L. Holmes, was hearsay evidence. What Wright said could not affect the interest of either party.

[10.] What the presiding Judge stated in the hearing of the jury, and which is set forth in the fourth ground of the motion for a new trial, was said necessarily in deciding a motion made by counsel to reject the marriage contract as evidence, on the ground that its execution had not been proven.

The fifth ground of the motion for a new trial, was overruled by the Court below, because it did not truly state the ground of the decision. The motion for a continuance, and the grounds on which it was made are not set forth in the record. It is a conditional exception.

We think that the verdict of the jury was warranted by the evidence, the equity and justice of the case, and that the judgment of the Court below must therefore be affirmed.

Judgment affirmed.