THE SAVANNAH, FLORIDA AND WESTERN RAILWAY COMPANY *vs.* HOLLAND.

| 82 | 257 |
| 92 | 338 |
| 82 | 257 |
| 112 | 557 |
| 82 | 257 |
| e120 | 458 |
| 82 | 257 |
| 121 | 468 |
| 82 | 257 |
| 123 | 358 |
| 123 | 777 |
| 82 | 257 |
| 126 | 61 |
| 82 | 257 |
| 129 | 846 |

1. The plaintiff, a passenger upon a railway, who left the train late at night, and in so doing (as he alleges) was injured by a fall which broke his leg, having pulled off his coat, detached his suspenders, bound up his broken limb, crawled through a culvert from one side of the railway to the other, seated himself on the cross-ties, and cried for help, his account of the manner of his leaving the train and receiving the injury, given to a person who reached him

v 82-17

about half an hour after first hearing his cries, was no part of the *res gestæ*, and being mere narrative of a past event, was not admissible evidence in his own behalf.

2.  When, on cross-examination, a witness is interrogated as to a conversation, with a view to laying the foundation for impeaching him, he has a right to give the whole conversation so far as it is pertinent, and this without reference to whether the other interlocutor was an agent of the cross-examining party or not.

3.  When one, in the interest of a party to the cause, has maneuvered to entrap or corrupt an adverse witness, and the evidence suggests that he was sent on some mission to the witness by the attorney of the party whose interest he sought to promote, the court may charge the jury on the question whether his authority, if any he had, was pure or impure—whether it was limited to the use of proper means for the attainment of right ends, or extended to such means as were actually used, and to ends apparently improper and illegal. Both the fact and the nature of the agency are open to the jury, and the evidence warranted the consideration of both.

4.  In order for the jury to assess punitive damages in an action for a tort, it is not necessary that they shall be claimed, *eo nomine*, in the declaration. It is enough that the facts alleged and proved be such as to warrant the assessment.

March 1, 1889.

Railroads. *Res gestæ.* Witness. Charge of court. Principal and agent. Attorney and client. Damages. Before Judge BOWER. Mitchell superior court. November term, 1887.

Thomas E. Holland sued the railway company for $10,000 damages, alleging, in brief, that he was a passenger on its train, going from Valdosta to Camilla, at night; that its servants negligently failed to notify him of the arrival of the train at Camilla, and he was ignorant when it did arrive there; that soon after passing that town, he discovered that he was being carried beyond his destination, and when the train was about 250 yards north of the town and depot of the company, he informed the conductor of the fact and requested him to stop the train and allow him to alight; which he

could have done safely had the request been complied
with; that the conductor angrily inquired why he had
not left at the station, and did not then stop the train, but
after it had passed about one mile north of the station
and while the cars were moving rapidly, commanded the
plaintiff to jump from the platform of one of them, and
on plaintiff's demurring to this, the conductor informed
him that he would not stop the train or further check
its speed, assured plaintiff that he could jump from the
platform safely, repeated his order to do so, and push-
ing plaintiff outward from the steps, compelled him to
jump from the moving train, from which he was thrown
off a trestle or culvert a distance of twelve feet or more,
whereby he was injured. The extent and character of
his injury will appear from the report of the evidence.
[ On the trial (which seems to have been a second one),
the testimony of the plaintiff showed, in brief, as fol-
lows: He bought a ticket at Valdosta to go to Camilla
on a night passenger-train; he did not know when it
reached Camilla until after it passed that town, because
he was asleep. A "little piece" above Camilla he woke
up, went to the conductor and asked him if they had
got to Camilla; the conductor replied yes, they had just
passed it; that he would put plaintiff off out there. He
jerked the bell-line, and the two went out on the steps,
and the conductor told plaintiff to "hop off." Plaintiff
said he did not want to hop off. The train was going
along. The conductor said, "Hop off, it won't hurt
you; I don't want to stop my train." He put his hand
on plaintiff's shoulder, and he fell to the ground in a
damp, sandy place which had a trestle over it; and the
train did not stop. He did not bound or fall over, but
squatted or sat on his left foot in the place where he
struck. The plaintiff's left leg was broken so badly
that it had to be amputated fifteen or sixteen days

afterwards; he suffered greatly. Before this, he had earned $4.50 per week and his board as a teamster, and also made crops in farming. Before the injury, he was healthy and did good work, but can do little, if anything since. When the plaintiff fell, the speed of the train had slackened somewhat, and it was moving, as he thought, about eight or ten miles an hour. Neither the conductor nor any one else had any light. No one aroused plaintiff and told him that they were approaching Camilla. A small swallow of gin, taken about three o'clock in the afternoon, was all the intoxicating liquor he had drunk that day, and he was sober when hurt. He was, in part, corroborated by two witnesses, whose testimony tended to show, among other things, that the station Camilla was not called, and that the train did not stop there.

On cross-examination, one of these (Branch) was asked, and answered, as follows: Question: Didn't you state, in the presence of L. A. M. Collins at your house on the fourth of this month, that Holland was drunk that night, and that the train did stop? Answer: No sir, I didn't make any such statements. Q. Didn't you say that he was tipsy? A. No sir, I didn't say anything to that effect. Q. Didn't you state, in the presence of Collins at your house about the fourth of this month, that the train did stop when Holland got off? A. I stated to him that the train stopped; he asked me if the train stopped, and I told him that it did; but he didn't ask me where, and I didn't say where. Q. Didn't you tell Collins that the train stopped when Holland got off? A. No sir, he asked me if the train stopped; we were talking about the case one way and another, and he simply asked me if the train stopped, and I said yes, but I didn't say where. Q. You say, then, that you didn't tell Collins, at your house on the

fourth of this month, that the train stopped when Holland got off? A. No sir, here was the way it was: there was a man there by the name of Mr. H. M. Hitt, who came with Mr. Collins, and that night Hitt got to talking about the case; Mr. Collins is a resident of this county here; and Hitt said to me— Here counsel for defendant interrupted, saying, "Never mind what Hitt said." Counsel for plaintiff insisted that the witness had the right to explain, and the judge so ruled. The witness then explained, in substance, as follows: Hitt said to me, I can make some money out of this railroad, and asked me if I could not be induced to stay away from court. I told him I did not expect to come to court any way. He said he could make a lot of money out of this thing if he could get me to stay away from court. I just nodded my head to him. He said, we want to make this statement for the railroad: that the train stopped and that Holland was drunk. I nodded my head to him, and never said that Holland was drunk or that the train stopped. He asked me if I would not do that—if I could not be induced to stay away from court. I told him that I did not expect to go to court any way, as I could not leave my family. It was all in the presence of Collins, who said nothing. Hitt said he could make $1,500 to $2,000, and would give me half of it to stay away from court, provided he could work it right, and would be back in seven or eight days and see me about it. I said nothing to him, only nodded my head. Then Hitt asked me what I would ask to make a misstatement in the case—to swear in the presence of Collins that the train stopped. I told him that I would not do it, but would swear to the truth, as I did on the first trial. The next morning Collins asked me if the train stopped, and I told him yes, but I did not say where at. When

they came the night before, they fetched a jug of liquor with them; it was "railroad whiskey" they said, and tried to get me to drink and talk about the railroad.— This was admitted over objections of counsel for defendant. Branch further denied that he had said anything about plaintiff's being drunk.

A witness for the plaintiff (Rackley) testified that, between 12 and 1 o'clock, he heard the plaintiff's cries for help, and went to him, reaching him in about half an hour, and that plaintiff commenced to tell him how he got his leg broke. Counsel for defendant objected to the admission of plaintiff's statement. The court admitted it as a part of the *res gestæ*. Rackley then testified that plaintiff said that the conductor took him to the door; that the train was nearly stopped, but did not stop, and when he got to the door it was going faster; that he told the conductor that it was going too fast for him to get off, and the conductor told him it was not, put his hand on his shoulder, told him to jump off quick, and pushed him, and he fell and broke his leg; and that he cried to the conductor to stop and take him on, but they were going so fast he did not know whether or not he was heard.

The evidence for the defendant showed, in brief, as follows: The conductor took up plaintiff's ticket, and when the train was within about a mile of Camilla, woke him and told him the next station was his, and the plaintiff replied "all right." Just before reaching the station, the train-hand called it out; the train stopped at Camilla three or four minutes; after leaving, the conductor again entered the car, and on seeing plaintiff, asked him why he did not get off. The plaintiff replied he had been asleep, and asked how far it was from Camilla, and on being told it was about half a mile, he asked to be allowed to get off. The conductor pulled the bell-line

and the train soon came to a dead stop.   The conductor
stood on the steps of the platform, lantern in hand; the
plaintiff stepped off on solid ground about two and a
half feet from the . car-step; then the conductor waved
his lantern and the train moved on.   Nothing more was
seen of plaintiff, and no one on the train knew of his
being hurt that night, nor until some time afterwards
The conductor did not touch the plaintiff; the place
where he alighted was beyond the trestle and the train
.had passed over it, the engine being three hundred feet
from it, and the .remainder of the train consisting of
three coaches; the train stopped fifteen or twenty seconds.
A witness testified that he looked out the rear of the last
coach when the train stopped, and the trestle was a num-
ber of feet back.   About thirty-six hours after the in-
jury, a witness made a plaster cast of the tracks found
in the soft, damp clay, below the trestle, about three feet
away from it on the west side; these tracks pointed
southwestwardly from the railroad track; the left one
seemed to be deeper than the right, which appeared as
if the left knee had slid over it, or rested in it; the left
heel seemed to go deeper than the ball of the foot.   This
witness testified ·that he compared the plaintiff's shoe
with one of these tracks, and it fit it.   Some of the tes-
timony for the plaintiff tended to show that these were
his tracks.   There was testimony to the effect that plain-
tiff must have been thrown forward if· the train had
been moving, and could not·have remained in the spot
he struck.   Collins, a witness for the defendant who has
before been referred to, testified that Branch had stated
to him that the plaintiff was tight or drunk.   He further
testified that on the occasion of his and Hitt's visit to
Branch, nothing was said in witness's presence about
any money to be made if Branch should testify differ-
ently from what he had done; and that what Branch

said to them he said voluntarily. Much evidence, including mortality tables, was introduced by both sides, but the above seems to contain the material facts.

The jury found for the plaintiff $4,165. The defendant moved for a new trial on the grounds that the verdict was contrary to law and evidence; and by amendment, the following grounds were added :

(1) After charging, at the request of defendant, that Branch's testimony as to Hitt's saying that the whiskey was railroad whiskey was hearsay and could not be considered as tending to show that the defendant had anything to do with the whiskey, nor could the jury consider Branch's testimony as to propositions for him to stay away from court or to change his testimony as tending to show any attempt on the part of the company to get him to stay away or to change his testimony, and that if Hitt made any such propositions the company would not be responsible for them, the court added this charge : " The presumption is that the defendant, the railroad company, did not authorize them, unless the evidence shows that the defendant authorized him to make such propositions. The presumption is always with the honesty of both of the parties and would be in favor [of the presumption] that the railroad did not authorize him, unless the evidence shows and satisfies the jury that they did authorize him."— Error, because there was no evidence from which the jury could legally find that Hitt was authorized by the company to make the statements and propositions referred to.

(2) The court charged thus : " I charge you that you are not to take in evidence, as stated, the plaintiff's declaration ; it is only the pleadings in the case, and the proof must be outside of the pleadings ; that is, the plaintiff's declaration is no proof; you must consider

the case upon the evidence submitted before you."—
Error, because the defendant contended that the jury
might consider the statements of the declaration, espe-
cially as to his requesting the conductor to stop the
train and put him off, as admissions.

(3) The court charged: "In determining that, you
will see what his occupation was beforehand, what he
could make, and what his capacity was; it is not
for the court to say what he could make or what
his capacity was; it is for you to see what he
was making and could make before he received the
injuries, and see what he could make or is ca-
pable of making since receiving the injuries, and
give him the difference."—Error because, if the jury
found for the plaintiff, they were required to give him
the difference between what he could make before he
was injured, and what he could make afterwards, with-
out reducing such difference to its value at the time the
verdict was rendered.

(4) The court charged: "If you should find from
the evidence that the defendant's employé, the conduc-
tor, pushed the man off of the train and caused the in-
juries, and that he did it intentionally; that he used
rude and rough conduct towards the passenger, another
character of damages would enter the case, what is
called in law punitive damages, and what is called a
punishment for the defendant for intentional bad treat-
ment that the plaintiff received at the hands of the de-
fendant. The character of damages, however, would
be based upon intentional bad conduct alone. If the
injuries were received by the plaintiff without any
bad conduct on the part of the defendant, intentional
bad conduct, then this character of damages would not
be assessed. You will look to the evidence to see how
that was. But if the defendant (when I say defendant

I mean the employés and servants of the defendant) was rough, rude, violent or anything of that sort towards the plaintiff, and pushed him off of the train intentionally, then the character of damages would also rise in the case, to be fixed by the jury at whatever they thought would be right and proper for that character of damages."—Error because, under the declaration, the plaintiff did not claim punitive damages.

(5) The court erred in admitting the testimony of Branch, which is above set out; the objection being that it was irrelevant, and that it did not appear that Hitt was in any way connected with the defendant.

(6) The court erred in admitting the testimony of Rackley, as above set forth; the objection being that the statements of Holland which were thus introduced, occurred too long after the injury to be a part of the *res gestæ*.

The court certifies that the first and third grounds correctly recite part of his charge but not the whole of the charge upon those subjects. He overruled the motion for a new trial, and the defendant excepted.

CHISHOLM & ERWIN and S. T. KINGSBERY, for plaintiff in error.

W. M. HAMMOND and SPENCE & TWITTY, *contra*.

BLECKLEY, Chief Justice.

1. The plaintiff below, Holland, being a passenger upon the train, was carried past the station at which he wished to stop. Discovering the fact, he requested the conductor to let him off, and a vital question in the case was whether he alighted safely and received his injury afterwards, by falling through a trestle on his way back to the station, or whether he fell through the trestle in

alighting, by reason of being forced or pushed off at that point by the conductor. There is no doubt but that he was seriously injured by his fall, his leg being broken. No one witnessed the fall. He testified in his own behalf and made a case of gross negligence against the company. The evidence of another witness was admitted, over objection, as to what the plaintiff said in giving an account of the manner of his leaving the train and receiving the injury. When these declarations were made, the plaintiff had pulled off his coat, detached his suspenders, bound up his broken limb, crawled through a culvert from one side of the railway to another, seated himself on the cross-ties and cried for help. It was late at night. A person who heard his cry reached him about half an hour after first hearing him. To this person the statement was made; and the question is. was that statement a part of the *res gestæ?*

We think it was not. The code, §3773, declares that "Declarations accompanying an act or so nearly connected therewith in time as to be free from all suspicion of device or afterthought, are admissible in evidence as part of *res gestæ.*" It is manifest that the act by which the plaintiff was injured had completely terminated before his declarations were made, and that they were no accompaniment of the same. Were they so connected with it in time as to be free from all suspicion of device or afterthought? He had turned his attention from the act to measures looking to his own safety and comfort. He had certainly occupied his thoughts with something besides the facts and circumstances to which his declarations related. He had full opportunity, although no doubt under great suffering, to devise a story in his own interest, and there is no reason for concluding that he did not have capacity to take advantage of his opportunity. He was exposed to the temptation of fabricating

a story, if he needed the aid of invention, and the exposure was under circumstances calculated to excite suspicion that his statement was, or might have been, referable to deliberation and afterthought, rather than to spontaneous or instinctive utterance. This does not imply that he did fabricate, for he might not have done so; truth may have been with him and invention unnecessary. But as his declarations did not accompany · the act, they had to be so nearly connected therewith in time as to be free from all suspicion of device or afterthought. *Hall vs. The State*, 48 *Ga.* 607. If subject to suspicion · at all they were not admissible, although in the particular case the suspicion might be erroneous. In *Augusta Factory vs. Barnes*, 72 *Ga.* 218, the injured person was a child 14 years old, and she died from the injury. Her declarations, made half an hour after the injury was received, were admitted in evidence upon the ground that they were free from suspicion, this court saying, " It is scarcely credible that this little girl, while enduring such excruciating pain—perhaps torture would not be too strong a word to characterize it—from this frightful wound, would have been capable of framing a story with a view to her ultimate advantage of gain, or for any other ulterior purpose." In considering that case afterwards, in *Augusta & Summerville Railroad Co. vs. Randall*, 79 *Ga.* 311, in which latter case the declarations of a mature woman, not more remote in time, were held inadmissible, the court said: " That case must rest alone upon its own peculiar facts, and will not be extended beyond them. . . . The proximity of time in which declarations are made to the main transaction, is not the only test of their admissibility in evidence, but they must also be free from all suspicion of device or afterthought." It is obvious that upon this requisite of freedom from suspicion, the age and discretion of the

speaker must be of very considerable importance. We think the doctrine recognized generally by courts, others as well as our own, would require the exclusion of the evidence in this case. A somewhat thorough discussion of the subject will be found in the opinion by Earle, J., in Waldele *vs.* N. Y. C. & H. R. Railroad Co., 95 N. Y. 274, the facts of which case were quite as favorable for the admission of the evidence as are those of the present case, and it was ruled inadmissible.* An excellent chapter on the topic will be found in Wood's Prac. Ev., page 413 to 480. And see Meacham on Agency, §715. Inasmuch as the evidence of the plaintiff and that of the conductor differed to the degree of direct antagonism, upon the principal facts in issue, any illegal evidence may have turned the scale; and the declarations of the plaintiff being, as we have seen, inadmissible, we think a new trial should be had. For this reason the judgment denying a new trial is reversed.

2. The witness Branch, on cross-examination, was interrogated as to conversation in the presence of Collins, and as to conversation addressed to Collins. This was with a view to laying the foundation for impeaching him by the testimony of Collins. His answers, without the explanation which he was allowed to superadd, would not show that he might have been misunderstood by Collins as to the former conversation. With the explanation, the answers show plainly that Hitt did the talking or the most of it, and that Branch responded by nodding his head several times, without expressing himself in words. What Hitt said was pertinent to the subject-matter to which the cross-examination related, and the nodding of the head by the witness was perhaps ambiguous, meaning either that

---

*See Estell *vs.* The State (N. J.), 17 Ab. Rep. 118; Chicago, etc. R. R. *vs.* Becker (Ill.), 21 N. E. Rep. 524.

he understood what Hitt said, or that he assented to some of it as representing the truth of the case. The latter construction might have been put upon it by Collins, and the jury would not have known whether this was correct or not had not all the facts and circumstances of the conversation been brought to light as the witness detailed them. Indeed, without some of the explanation, they would not have even known that Branch expressed himself in this way at all. Whether Hitt was an agent of the company to talk as he did, is quite beside the question; for the company sought to affect the witness by the part he, the witness, took, or was supposed to have taken, in that conversation, no matter who or what the other interlocutor was. He had a right to show what the part attributable to himself really was, and in order to do so, under the peculiar circumstances it was necessary to detail all or much of what Hitt said. The general rule as to bringing out the whole of the pertinent matter of a conversation where a part of it is touched upon, is applicable to the present case with peculiar force, for here the conversation was conducted on one side by words and on the other chiefly by signs alone.

3. Hitt talked very improperly, and with an evident purpose to corrupt his host, Mr. Branch, as a witness. Collins was with him to hear what was said, and both, it seems, were sent by Bush, Esq'r, one of the company's counsel, to get up evidence to be used in the case. It does not appear in express terms that the company or that Bush directed or authorized the use of any improper means in the business of getting up evidence, but there can be no doubt that to obtain evidence and prepare for trial is within the scope of the powers of an attorney employed in the defence of a pending case. If Bush himself had used the means

to suborn evidence which Hitt used, the fact of his so doing would, it seems to us, have been admissible in evidence ; and if so, we see not why Hitt's conduct under Bush should not be admissible. The court charged fully and fairly as to the presumption that the company was free from complicity in the unlawful and improper conduct, but left the question to the jury as to how the matter really was, both in respect to the agency of Hitt and his authority from the company to conduct himself towards the witness as he did. There was no proof from Bush or any other witness that Hitt had transcended his authority, and this, together with all the facts and circumstances, could be considered by the jury. The evidence warranted the reference of the whole matter to the jury for their appraisement of its import and value as a factor in the general case.

4. The point made that punitive damages could not be recovered, because they were not claimed, *eo nomine,* is wholly without merit. The declaration lays damages at $10,000, and alleges a tort, with circumstances that may well be considered as an aggravation. The code, §3066, declares, " In every tort there may be aggravating circumstances, either in the act or the intention, and in that event the jury may give additional damages, either to deter the wrong-doer from repeating the trespass, or as compensation for the wounded feelings of the plaintiff." It certainly cannot be necessary for the plaintiff to set out in his declaration, in so many words, that he claims some or all of his damages as punitive. All he has to do is to make a case by his pleading and evidence which will entitle him to such damages in addition to those actually sustained.

We find no error in the record save as indicated in the first division of this opinion.

Judgment reversed.