40919.   ARCHER et al. v. GWINNETT COUNTY.

DECIDED SEPTEMBER 24, 1964—REHEARING DENIED
OCTOBER 9, 1964.

444

*Henderson & Pope, Merritt & Pruitt, James M. Roberts, R. F. Duncan,* for plaintiffs in error.

*Edward S. White, Allen E. Lockerman, Dudley S. Hancock,* contra.

NICHOLS, Presiding Judge. ■ One motion for a new trial was made on behalf of all the defendants; one bill of exceptions was sued out to this court; one brief was filed, signed by all the attorneys involved on behalf of the plaintiffs in error generally. Likewise, on the trial of the case, as stated by the trial judge in a note referring to the first special ground of the motion: "As the trial began, at the counsel table for the defendants were Messrs. Albert Henderson, Mation Pope, J. Ray Merritt and G. C. Pruitt, and possibly Judge John S. Wood. Mr. Albert Henderson was conducting the examination and cross examination of witnesses for the defendants. As the trial proceeded objections to testimony were made at different times by Mr. Henderson, Mr. Merritt and Mr. Pruitt. Thereafter, upon a statement made by Mr. Pruitt as follows: 'If the Court please, at this time we'd like to interpose an objection to that . . .' the court made the following ruling [on which error is assigned]: 'Now, gentlemen, I'm going to have to draw a rule right now, I'm going to have to have one counsel from the defense table making objections' . . . The court was never advised at any stage of the trial and did not know that defendants Vinson and Vinson & Co., Inc., were represented solely by Messrs. J. Ray Merritt and G. C. Pruitt, nor was such contention ever brought

to the attention of the court." Counsel failed to inform the trial court that two law firms were representing two groups of defendants separately rather than both groups jointly. Nor would an inspection of their records have helped him; the answer of the county commissioners was signed only by Hon. John S. Wood, who apparently took no active part in the trial, and the answer of Vinson and Vinson & Co. was signed by Vinson *in propria persona.* "Except as to matters of appellate procedure, the appellate courts are without jurisdiction to pass on a question concerning which the ruling of the trial judge was not invoked." *Durham v. Pitts,* 101 Ga. App. 437, 438 (114 SE2d 217). Since the court was not made aware that the limitation would result in any defendant or defendants being denied proper representation at the counsel table, the issue was not raised there and can not be considered here.

▪ The testimony of Robert Matson, chief witness for the plaintiff, was the subject of a motion to strike as well as of certain specific objections. Its substance, with the matter particularly objected to italicized, is as follows: Matson, a sales engineer, first learned in 1953 that the commissioners were interested in establishing a water system for Gwinnett County. He personally discussed this subject with them on 15 or 20 occasions, one, two or all being present at various times over a period of two and a half or three years; it was clearly brought out in these discussions that the advent of water was a necessity for county growth in the environs of metropolitan Atlanta; the witness was familiar with the general pattern of such public utility projects because he was calling on other municipalities engaged in installing water systems; the various steps and procedures were discussed at these meetings such as engagement of an engineering concern for the preliminary planning and methods of financing the project; all of these activities must seed out of the concern who gains the engineering contract for designing and overseeing the construction of the project; *there was no misunderstanding as to what the personal intentions of the defendant commissioners were; they had a personal interest; they expressed themselves as feeling that they gave much of their time for little compensation in the form of salaries; they asked what amount*

*of money a project of this kind could stand "and the statement was made in such a direct manner as to how much the Commissioners they themselves could expect to gain out of these funds in the construction of this project";* Archer, Cain and Dover were present at the time of this statement; the figure of 10% was mentioned by Mr. Archer; the witness advised him that such a sum of money was foolish and it would be almost impossible to get the project built with anything above five percent allotted to the "kickback"; he told them the easiest and safest way would be a kickback from the contractor himself; Messrs. Archer and Cain mentioned as their goal from the job a figure of a half million dollars; the witness was asked to find an engineer that would be suitable to the defendants for this project and this assignment was made "in the presence of more than one of the commissioners," probably Messrs. Archer and Dover; witness at first contacted several reputable firms but "they didn't want the kind that I had sent them previously; they wanted somebody of a different character and the basic understanding of their problems and what they sought and desired from the job"; witness was informed by Archer in no uncertain terms that they wanted an engineer whose morals and ethics would permit the money that they sought personally from the project; witness then visited Howard Barry, a contractor at Warner Robins and following a discussion Barry put in a call to the defendant Vinson in Atlanta in the witness' presence; the witness was introduced to Vinson by Barry and an appointment made which he later filled to talk to Vinson about the Gwinnett County water project; Mr. Barry had already made it clear to Vinson what kind of engineer the county commissioners were looking for; after his meeting with Vinson the witness reported back to Archer, after attempting to make the report to Dover and being informed by him that the handling of the engineer was being left to Archer by Dover and Cain; he gave Archer Vinson's qualifications by referring to work done elsewhere where payments had been made to other political individuals who were responsible for projects Vinson had been engineer on; Vinson & Company was later employed as the engineer for the job; Vinson later told the witness he was very dissatisfied with the job because of the rebates he

was having to make to the commissioners, which he described as 10% of his fee; in 1957 the witness met Mr. Archer in the post office, learned he was unemployed and in need of a job and asked him what ever happened to the money he got out of the Gwinnett County water system and Archer said *"it took all of that to get his brother out of hock."*

Counsel for the plaintiffs in error contend in their brief that the italicized portions of the above testimony should have been excluded as conclusions of the witness, and that all the testimony should have been stricken because "it tended to show that the defendants were corrupt characters long prior to the alleged conspiracy and . . . were interested in personal profit to themselves from county business." These objections are primarily calculated to exclude the evidence objected to on the ground that the conversations in question took place either before the alleged conspiracy between the county commissioners and Vinson commenced or after it ended, since the petition alleges that the commissioners conspired with the other defendants to receive the "kickbacks" between November 2, 1954, when the local constitutional amendment authorizing the issuance of revenue certificates for a water system was voted, and January 3, 1955, when Vinson & Company was employed as engineer on the project. However, it is the tort and not the conspiracy which is the gist of the suit; it is the damage and not the conspiracy which is actionable and proof of conspiracy only authorizes the plaintiff to recover against all the defendants as joint tortfeasors. *Woodruff v. Hughes,* 2 Ga. App. 361 (1) (58 SE 551). The county commissioners first would have had to agree among themselves as to the sort of contract they desired, and they could not well have agreed with the engineering company in such manner as to implement their wishes prior to the voting of the revenue bonds, which rendered the project feasible. Statements made by the commissioners with the fraudulent intent of locating an engineer who would be willing to grant them a rebate from the profit of the enterprise are not inadmissible because the engineering company had not yet been located and so was not yet a part of the conspiracy. The petition alleged a conspiracy between the commissioners and the engineering firm was entered into between the

dates given; to prove this it was competent to show a prior conspiracy amongst the commissioners themselves for the same purpose. One who, after a conspiracy is formed, and knowing of its existence and purpose joins in, is as much a party thereto as the original members. *Cook v. Robinson*, 216 Ga. 328 (4) (116 SE2d 742). "Thus, where two or more persons are charged with conspiring or entering into a mutual scheme to defraud, such a conspiracy or scheme may be shown by proof of facts evincing a concurrent knowledge and approbation in the persons conspiring, of each other's acts, and by proof of the separate acts of the several persons concentrating in the same purpose or particular object." *Holbert v. Allred*, 24 Ga. App. 727 (102 SE 192). Nor were the statements, in context, inadmissible as being merely conclusions of the witness, for while it would be a conclusion merely to say that the commissioners expressed themselves as having a personal interest, the conclusion was justified by the facts related. Cf. *West v. West*, 199 Ga. 378 (1) (34 SE2d 545); *Phillips v. Lindsey*, 65 Ga. 139 (1). Special grounds 2, 3, 4, 5, 6 and 7 insofar as they are insisted upon, show no error.

■ On cross examination, Matson was interrogated by counsel for the defendants as follows: "Q. You know how to accomplish a deal whereby public officials . . . could get kickbacks? You were already familiar with that sort of thing? A. . . . The way I found out about Mr. Barry was through another salesman who had had some dealings in Warner Robins project. Q. You had never participated in one yourself, previous to this time? A. Not a water project . . . Q. Well, what did you mean when you said not a water project? A. What I said, not a water project. Q. Well, in what other projects had you then, Mr. Witness, participated in crooked deals like this? A. The only one to my knowledge was here in Gwinnett County." On redirect counsel for the plaintiff elicited the following: "Q. Mr. Henderson asked you a moment ago whether you had experience in any other project where tactics or techniques of this sort were used and you said only one and that was in Gwinnett County. Will you tell the jury what that project was, Mr. Matson? A. Yes, sir, it was a culvert project.

Q. Describe it for them, please, sir. A. . . . And they wanted to know about putting it together and so forth, and how much money was set up for it. Q. You say they, who are you speaking of? A. That was the county commissioners. That was Mr. Cain, Mr. Dover and Mr. Archer. . . Then they wanted to know about the installation of this. I told them, well, I could install it for them, so then immediately we got into a conversation and it evolved that they pay to me approximately $1500, I in turn gave them back, oh, somewhere in the neighborhood of $400 apiece. I installed this culvert . . . the supervision of it, and actually physically worked at it. Q. Mr. Matson, in the transaction that you refer to, was there a pay-off? A. There was. Q. To whom? A. To Mr. Dover, Mr. Cain and Mr. Archer." Objection was to the statement on redirect examination on the ground that it was a transaction unconnected with the case on trial and was too remote in point of time. The latter objection cannot be confirmed from the record since the witness was never asked the time of the occurrence. As to the former, it only evidences the fact that the right of cross examination is a delicate weapon which frequently cuts both ways. *Code* § 38-410 provides: "When an admission shall be given in evidence, it shall be the right of the other party to have the whole admission and all the conversation connected therewith." In *Savannah, F. &c. R. Co. v. Holland,* 82 Ga. 257 (2) (10 SE 200, 14 ALR 158) it was stated: "When, on cross-examination, a witness is interrogated as to a conversation, with a view to laying the foundation for impeaching him, he has a right to give the whole conversation so far as it is pertinent, and this without reference to whether the other interlocutor was an agent of the cross-examining party or not." The witness here was asked, with a view to impeaching him, whether he had previously participated in a deal involving rebates to public officials. He admitted that he had done so, and it then became the right of the plaintiff to inquire into the whole of the transaction, including the fact that certain of the defendants were the persons with whom the witness was involved.

■ The instruction complained of in special ground 11 as follows: "A conspiracy may be inferred sometimes from the

nature of the acts done, the relations of the parties, the interest of the alleged conspirators, and other circumstances," is a correct statement of law. *Woodruff v. Hughes*, 2 Ga. App. 361, 365, supra; *Horton v. Johnson*, 192 Ga. 338, 346 (15 SE2d 605); *Huckaby v. Griffin Hosiery Mills*, 205 Ga. 88, 91 (52 SE2d 585). It was appropriate to the case and was not rendered erroneous because of the fact that the court did not attempt to define what is meant by "other circumstances."

■ Special grounds 9 and 10 will be discussed in connection with the general grounds of the motion for a new trial. In addition to Matson's testimony which has been set out above in some detail, Barry testified that at the time of the telephone conversation when he introduced Matson to Vinson he did so by explaining that Matson was looking for "a pretty good engineering firm that wasn't too honest." Welker, an engineer, testified that he had a conference with the defendant commissioners during the fall of 1954 regarding possible employment in the water project and was asked, "How do we get ours?" The commissioner then expanded the question by stating that they wanted 10% of the project. Pund, another engineer, had a conference with Dover in October, 1954, was told by Dover that whatever Archer said would be agreeable with him, and later talked to Archer, who asked, "How can we get something out of this project?" Hughes related a statement made to him by Vinson in 1955 that he, Vinson, had paid the commissioners $10,000 apiece on the project and that they would do whatever he told them to do. This witness was upset by this, considered it a slanderous remark, and went to the three defendant commissioners together, urging them to replace Vinson with another firm because he believed Vinson was dishonest. After Vinson had been "enthusiastically defended" by Archer, Hughes repeated the remark made by Vinson, after which "either Mr. Dover or Mr. Archer said, 'I don't know why he wants to go around making a statement like that,' and that is as close as any of the three of them ever came to a denial." Hughes then formed a citizens' committee which employed counsel and eventually succeeded in having Vinson separated from the project. There was also considerable testimony which need not be set out in detail as to amounts con-

tracted to be paid from which it appeared that substantially lower bids might have been available from reputable firms recommended to the defendants at the time of their initial investigation.

The evidence as a whole amply authorized the inference that the three commissioners had agreed among themselves to let the contract for the water supply to an engineering firm which would allow them to profit personally from the enterprise; that such personal profit was fraudulent and illegal; that the defendants Vinson and Vinson & Company understood they were being chosen over other firms because they were "not too honest"; that they closed the deal on this basis and did in fact rebate $10,000 to each of the defendant commissioners. The effect of the testimony was of course to allow the county to seek damages against all of the defendants jointly. *Cook v. Robinson*, 216 Ga. 328, supra. In the course of developing the proof objections were made, such as the one set out in special ground 9 to testimony by Pund that Archer had said, "How can we get something out of this project?" on the ground it had not been proved that the other commissioners gave Archer authority to make such a statement for them. As stated in *Grant v. Hart*, 197 Ga. 662 (8) (30 SE2d 271) : "The evidence authorized the verdict finding that the defendant participated in the alleged fraudulent conspiracy. The defendant being thus a co-conspirator, evidence relating to similar transactions by his co-conspirators was not inadmissible for the alleged reason that it did not connect the defendant therewith." In deciding whether or not the objection was good, the court necessarily had to decide whether sufficient evidence of conspiracy had been introduced to make the testimony admissible as against the co-defendants. As to a similar objection (to Hughes' statement that Vinson said he had paid the commissioners $10,000) the judge ruled: "The court is of the opinion that a prima facie conspiracy may have been made out by the evidence that has been testified, and I will allow this witness to testify, and I'll undertake to charge the jury at the proper time as to what [effect] the testimony may or may not have as to the other defendants in this case." It is contended by special ground 10 that this is an expression of opinion in violation of

*Code* § 81-1104. As we have seen, the court did charge properly the law of conspiracy, leaving it to the jury to decide whether a conspiracy between some or all of the defendants had been proved by the evidence. Since the statement that in his opinion a prima facie conspiracy might have been proved was made as a necessary preliminary to the ruling invoked, this inhibition is not contravened. The judge "may not express to the jury any opinion; but if in the decision of any legal question, as it arises, he must pass upon facts, the statute does not apply." *Scarborough v. State*, 46 Ga. 26, 33, and see *Reinhart v. Miller*, 22 Ga. 402, 417 (68 AD 506). Neither the general grounds of the motion for a new trial nor special grounds 9 and 10 show error.

The trial court did not err in overruling the motion for a new trial.

*Judgment affirmed. Jordan and Eberhardt, JJ., concur.*