THE CENTRAL RAILROAD & BANKING CO. *v.* KITCHENS.

1. Homicide being alleged, the mode of committing it may be particularly specified by amendment without adding a new cause of action.
2. Though declarations be no part of the *res gestæ*, their admission in evidence, unless objected to on the proper ground, is no cause for a new trial.
3. A rule of a railroad company applicable alike to all persons of a given class, is not to be evaded by the failure of one person of the class to observe the rule, when another person of the same class is injured thereby.
4. Negligence is a question for the jury.
5. An employé of a railway company being himself at fault, and thus contributing to his death, his widow cannot recover.

May 22, 1889.

Pleadings. Actions. Amendment. Evidence. *Res gestæ.* Practice. Railroads. Negligence. Before Judge HARRIS. City court of Macon. December term, 1888.

This report is to be taken in connection with the facts stated in the decision.

The plaintiff testified, in brief, as follows: When her husband (Abe Kitchens) was killed, he was twenty-nine years old, and earned $1.10 per day. After the accident (from which he died), he was brought home, three miles from where it occurred, at about one o'clock, by Sandy Williams and a driver of an express wagon. He said, immediately after he got home, that he was lying down under a car, screwing on a nut; that Tom Troutman told him to get a shoe to put on the same car and to go around on the other side of the car and screw on the nut, but he heard the lumbering of the

train and went to jump backwards and fell, and some part of the car struck him and caught his left leg. He also said he asked Troutman if the flag was up. Troutman was his boss man. Mr. Dickinson was absent, and then the work was under Troutman. The deceased's business was to inspect cars, screw on nuts and put shoes on. He screwed up loose bolts·when trains came in. Troutman told plaintiff, the same week the injury happened, that he sent Abe under the car to screw on a nut, and was squatting down when Abe said, "Uncle Tom, look out." Then he (?) said it was a little job, and they could get that done without a flag up.

Tom Troutman, introduced by the plaintiff, testified, in brief, as follows : He is a car-greaser for defendant, and when bolts are to be screwed on does that. He inspects around the trains and sees about fixing anything that is wrong. His work is done in the yard, and there is no special track for repairs. The switch-engine was the engine which made up the trains, and the engineers of the switch-engines knew that it was the custom to mend cars on the side-track, but they did not know whether he and Abe Kitchens were at work there at the time of the accident or not. Witness did not know whether the engineer saw them or not. Mr. Dickinson was boss, and did not delegate his authority to witness when he was absent. Witness did not tell either Abe Kitchens or his wife that he was Abe's boss. He was a fellow-workman with Abe. Was present when Abe was killed, and he was right down in the middle of the track on his back. Saw him screwing on the nut, and told him to go and get a big washer and put on. Witness was working on the brake-beam, and Abe came back and commenced putting the washer on. He had just about got finished, and as witness straightened up, heard the slack of the train and said " Look

out!" Did not tell the engineer anything about it; did not holler; did nothing at all. There was great excitement. There were a number of cars between Abe and the engine. Abe knew the switch-engine was not on that train; it backed to it, and the train was so long that the noise never came down to where he was. When he and Abe knew anything about it, it was pulling right ahead. Abe did not have out the danger signal, which he knew ought to be out and which it was his business to put out. When it is out, they do not move the cars; that is the uniform rule to keep the engine from running back on us. Of course if the flag is there they will not run back on us. Mr. Dickinson always told us that we were never to work under the cars without putting out the flag, but that morning we did not have it out. The accident happened about 10 o'clock. It was as much witness's duty to put up the danger signal as it was Abe's. He went to work first that morning. He always put up the danger signals when he was going to work under the cars, but not when he was working outside. It is a rule of the company to put out a flag when they are working on a car. When the car struck Abe he did not say, " My God, Tom, is not the flag up ?" nor did witness so tell Abe's wife. Witness did not put up the flag, because he did not go under the cars. He did not tell Abe when he went under that the flag was not up. Each car-greaser is furnished with his own flag as a danger signal, and it is his duty to carry it when he is going to work. Don't know whether Abe had his flag by him when he was at work; it was his duty to have one.

The testimony introduced by defendant tended, in brief, to show the following : Kitchens and Troutman were fellow-workmen, Troutman not being boss. It was a rule of the company that they should be furnished with a flag, as a danger signal, and that they

should put it out when they went to work under a car. Kitchens was instructed in this rule and furnished with a flag. The flag was not out when he was hurt. The employés of the defendant who were on and about the switch-engine looked out on both sides of the train of cars·to see if there was a flag out, and seeing none, moved the train. Kitchens, immediately after he was hurt, stated that he did not put the flag up because he had such a small job he thought he could get done before the cars were moved; and that it was his fault that he did not have the flag up. The employés in charge of the engine had no knowedge of his being under the car, and had no reason to suspect that there was anybody under there. Sandy Williams testified that he went home with Abe about half an hour after he was hurt, and they were about an hour and a half going there. Did not remember Abe's telling his wife anything after he got home. They were all very much excited. Abe said he was fastening a screw, and told Tom to look out, and then they pulled the train on him; and he did not have any flag up.

The jury found for the plaintiff $350. Defendant moved for a new trial on the grounds stated in the decision. The second of these was because of error in permitting the plaintiff to testify as to declarations made by her husband after the injury, and after he had been carried three miles to where she lived; it not appearing how long a time had intervened between the injury and the declarations, nor any other circumstances going to corroborate or justify such statement as parts of the *res gestæ;* and because they were statements of husband to wife. The court stated, in a note to this ground, that there was evidence of the time by Sandy Williams and by plaintiff.

R. F. LYON, for plaintiff in error.

M. G. BAYNE, by brief, *contra.*

BLECKLEY, Chief Justice.

The declaration alleged that the company had injured and damaged the plaintiff in the sum of $25,000, for that on the ——day of May, 1888, by the careless running of its cars, the company ran over, mutilated and killed her husband, Abe Kitchens, without any carelessness or fault upon his part, but entirely by the negligence of the agents of said company in running the cars thereof; whereby she was injured and damaged. The company demurred to the declaration, on the ground that it set forth no sufficient cause of action, there being no specific or particular act of negligence alleged. The demurrer was overruled, and the plaintiff was allowed to amend her declaration, to the effect that her husband was an employé of the company, and was under a car at work in the line of his duty, in pursuance of an order of Tom Troutman, who was his superior, and while doing said work, a switch-engine struck back against a large number of cars, including the one he was under, and without any fault on his part, he was run over and so injured that he died. This amendment was objected to on the ground that there was nothing to amend by, and that the amendment made a new cause of action. The case was tried, and a motion for nonsuit being overruled, there was a verdict for the plaintiff. The company made a motion for a new trial, on the general grounds, and on several special grounds, one of which was that certain declarations of the deceased were admitted in evidence; another, that the court erred in charging that if it was the duty of Troutman to put up the danger signal for the protection of Kitchens as well as himself, and Troutman failed to do it, and if Kitchens relied upon this and it was not done, then the jury might be justified in finding negligence on Troutman's part, and none on the part of Kitchens, and that they might then find a verdict for the plaintiff; adding that

all this depends, however, upon whether there was fault or negligence in Kitchens—the jury being the exclusive judges of the negligence. The overruling of the demurrer to the declaration, and of the objection to the amendment, and the denial of the motion to nonsuit, were excepted to, as was the refusal to grant a new trial.

1. The declaration, though it might have been too general, embraced a cause of action, and was amendable. The amendment introduced no new cause of action, but only explained more specifically and with greater particularity that which the original declaration comprehended. The cause of action was the homicide of the plaintiff's husband, and the amendment served to describe more minutely than did the original declaration the mode in which the homicide was committed. *Harris* v. *Central Railroad*, 78 *Ga.* 525.

2. We think the record indicates that the sayings of the plaintiff's husband were not a part of the *res gestæ*, and had they been objected to on the proper ground, they should have been excluded. *Railroad Co.* v. *Holland*, 82 *Ga.* 257. But there is no statement in the record that they were objected to at all, and consequently we cannot hold that there was any error in admitting them.

3. The charge as to putting up the danger signal was error, the evidence being that the rule of the company as to that duty applied no less to the deceased than to Troutman. It was no excuse on the part of the deceased that Troutman failed to obey a rule which was applicable equally to both persons concerned in the violation of the rule. *Railroad Company* v. *McDade*, 59 *Ga.* 73.

4. Of course there was no error in referring the question of negligence to the jury after the motion to nonsuit was overruled. See *Georgia Reports*, *passim*. If

the case were trimmed down to the legal evidence only, very likely a nonsuit might have been granted.

5. The verdict was clearly contrary to law and evidence, inasmuch as the homicide resulted from the failure of the plaintiff's husband to observe a rule of the road requiring him to display a signal when at work under a car. According to the evidence, if this signal had been put out, there is every probability that the calamity would not have happened. Employés cannot be permitted to violate the rules of the service in which they are engaged, and thereby create a cause of action in favor of themselves or their widows. Indirect suicide gives no title to *post mortem* reward.

The court erred in not granting a new trial.

*Judgment reversed.*